## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 Involuntary |
| | ) | |
| Nassau Broadcasting I, LLC, | ) | Case No. 11-12931 (KG) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 7 Involuntary |
| | ) | |
| Nassau Broadcasting II, LLC, | ) | Case No. 11-12932 (KG) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 7 Involuntary |
| | ) | |
| Nassau Broadcasting III, LLC, | ) | Case No. 11-12933 (KG) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 7 Involuntary |
| | ) | |
| Nassau Broadcasting Partners, L.P., | ) | Case No. 11-12934 (KG) |
| | ) | |
| Debtor. | ) | |
| | ) | |

### ALLEGED DEBTORS' JOINT RESPONSE TO PETITIONING CREDITORS' MOTION PURSUANT TO SECTIONS 105(A) AND 303(F) OF THE BANKRUPTCY CODE FOR ENTRY OF AN ORDER PLACING A LIMITED RESTRICTION ON THE ALLEGED DEBTORS' USE OF ESTATE ASSETS

Nassau Broadcasting I, LLC, Nassau Broadcasting II, LLC, Nassau Broadcasting

III, LLC and Nassau Broadcasting Partners, L.P. (collectively, the "Alleged Debtors")[1], by and

through their undersigned counsel, respectfully submit this joint response (the "Response") to the

---

[1] The Alleged Debtors are the following entities (last four digits of EIN in parentheses): (i) Nassau Broadcasting Partners, L.P., a Delaware limited partnership (9866), (ii) Nassau Broadcasting I, LLC, a Delaware limited liability company (7047), (iii) Nassau Broadcasting II, LLC, a Delaware limited liability company (2048), and (iv) Nassau Broadcasting III, LLC, a Delaware limited liability company (9570). The mailing address for the Debtors is 619 Alexander Road, Third Floor, Princeton, NJ 08540.

Motion of Petitioning Creditors Pursuant to Sections 105(a) and 303(f) of the Bankruptcy Code for Entry of an Order Placing a Limited Restriction on the Alleged Debtors' Use of Estate Assets (the "Motion"), proffered by three (3) members of the Alleged Debtors' lender syndicate (together, the "Petitioners").[2]  In support hereof, the Alleged Debtors, owners and operators of 49 radio stations in the Mid Atlantic and New England regions, respectfully state as follows:

## PRELIMINARY STATEMENT

1.    The Petitioners commenced these involuntary proceedings as part of an orchestrated strategy by the broader syndicate of lenders (of which the Petitioners are part) to impose a liquidation upon these business enterprises, *after the lenders themselves unilaterally rescinded an out-of-court restructuring agreement that was extensively negotiated and agreed to in writing in April of 2009, and which the parties spent nearly two years, countless hours and millions of dollars in fees and expenses pursuing*, in a then collective and collaborative effort to avoid the possibility of bankruptcy filings for these businesses.  In lieu of further consensual negotiations to address the outstanding indebtedness owing to the lender syndicate, the agent for the lender syndicate recently demanded that the Alleged Debtors immediately file chapter 11 bankruptcy cases and effectuate a liquidation and sale of substantially all of their assets under Bankruptcy Code section 363 to the lenders and for their benefit.  But, when the Alleged Debtors sought to engage in discussions concerning the terms of such a possible sale or strategic alternatives in order to avoid the possibility of potentially costly and disruptive bankruptcy proceedings, the Petitioners took the unwarranted step of seeking a chapter 7 liquidation of the Alleged Debtors.

---

[2]  The Petitioners are holders of debt outstanding under that certain Second Amended and Restated Credit Guaranty Agreement ("Credit Agreement") dated as of June 30, 2005, to which some or all of the Alleged Debtors are parties, and under which Goldman Sachs Credit Partners, L.P serves as administrative agent.

#14954756 v5

2.    In furtherance of their strategy to compel the Alleged Debtors to pursue a liquidation of their assets for the sole benefit of the lender syndicate, the Petitioners have now sought to "poison the well" by making baseless assertions regarding the Alleged Debtors' utilization of their resources during the involuntary gap period.  Make no mistake – that is precisely what the Petitioners are seeking to accomplish here – that is, to emerge from the wreckage wielding the club that the Alleged Debtors should not be permitted to pursue a viable reorganization strategy other than by immediately liquidating their assets to and for the sole benefit of the lender syndicate.  In the past few weeks, the Alleged Debtors' Boards of Directors, senior management and professionals have been focused on attempting to protect and preserve the value of these businesses and to prepare an appropriate response, consistent with their respective fiduciary obligations, to hopefully return the restructuring discussions to the conference room rather than the courtroom.

3.    The so-called "limited" relief demanded in the Motion, which is being pursued nearly two (2) weeks after the involuntary petitions were filed by the Petitioners, should be denied for the simple reason that the Petitioners cannot carry their rigorous evidentiary burden of demonstrating that the Alleged Debtors – or any insiders thereof – are improperly disposing of assets or otherwise causing harm to these valuable radio broadcasting businesses.  Rather, the Alleged Debtors have and continue to operate their businesses in a prudent and appropriate fashion, and on a positive cash flow basis, during the involuntary gap period, in spite of the efforts of the Petitioners to foreclose the Alleged Debtors' restructuring options.

4.    For these reasons, and the reasons set forth below, the Alleged Debtors respectfully request that the Court deny the Motion, or, alternatively, enter an order substantially consistent with the attached proposed Order and which is appropriate under the circumstances of these involuntary proceedings.

#14954756 v5

## BACKGROUND

5.   On September 28, 2011, 13 days after the Petitioners filed their involuntary chapter 7 petitions against the Alleged Debtors, the Petitioners filed the Motion seeking to prohibit certain types of payments and expenditures by the Alleged Debtors during the remaining period pending the Court's determination of whether orders for relief under chapter 7 should be entered against the Alleged Debtors (the "Gap Period").

6.   As of this writing, the Alleged Debtors intend to interpose an answer to the involuntary petitions on or before October 6, 2011 and to also seek the conversion of these involuntary chapter 7 cases to cases under chapter 11 of title 11 of the United States Code (11 U.S.C. §§ 101 *et. seq.*, as amended, the "Bankruptcy Code"), pursuant to section 706(a) of the Bankruptcy Code.  In all likelihood, and as a practical matter, the remainder of the Gap Period will be quite limited, as the Debtors reasonably anticipate the entry of orders for relief under chapter 11 of the Bankruptcy Code in short order.

7.   The Alleged Debtors' obligations under the Credit Agreement matured on or about September 30, 2008.  Prior to September 2008, the Alleged Debtors never missed an interest payment to the agent for the lender syndicate.  In the months leading up to, and immediately succeeding, maturity of the obligations under the Credit Agreement, the Alleged Debtors and the lender syndicate engaged in extensive and productive negotiations designed to address the overall lending relationship and in the context of a global out-of-court restructure in respect of the Alleged Debtors and their capital structure.

8.   Those discussions lead to the parties reaching an agreement in principal in late 2008 as to the material terms of an out-of-court restructuring agreement (the "Restructuring Agreement") for the Alleged Debtors, which was formally executed and delivered by the parties on April 15, 2009.

#14954756 v5

9. The parties spent many months working in a largely collaborative fashion to consummate and implement the terms of the Restructuring Agreement, including seeking and obtaining FCC approvals attendant to the process and the like. In addition, the Alleged Debtors accomplished the sale and disposition of one of its radio stations in November of 2009 situated in the Boston, MA market, and proceeds of $10,751,000 were paid by the Alleged Debtors to the agent for the lender syndicate, all in furtherance of the Restructuring Agreement. This, in addition to $2.5 million that was paid by the Alleged Debtors, in the aggregate, to the various attorneys for the lender syndicate in the past 18 months.

10. In spite of the significant progress that the parties had and continued to make towards consummating and implementing the Restructuring Agreement, the lender syndicate unilaterally terminated the same in April of 2011. Faced with the prospect that the Alleged Debtors may be forced into bankruptcy proceedings - which they genuinely hoped to avoid - the Alleged Debtors spent the ensuing months working in good faith to reach an alternative agreement with the lender syndicate, again in an effort to avoid the cost, expense and distraction of bankruptcy proceedings.

11. Notwithstanding the Alleged Debtors good faith efforts to achieve (for a second time) an out-of-court arrangement with their lender syndicate, as outlined above, the Petitioners opted to file involuntary chapter 7 petitions against the Alleged Debtors on September 15, 2011.

## SUBSTANTIVE RESPONSE

### A.    Section 303(1) of the Bankruptcy Code Permits the Alleged Debtors to Continue Using Their Property and Assets During The Gap Period

12. Section 303(f) of the Bankruptcy Code provides that, unless the court orders otherwise, an alleged debtor is free to continue to operate its business and use, acquire and dispose of property as if the involuntary petition was not filed. 11 U.S.C. § 303(f). Courts have

#14954756 v5

described that right as "[t]he most important protection given [an alleged debtor] by the Code." *In re DiLorenzo,* 161 B.R. 752, 754 (Bankr. S.D.N.Y. 1993) (citing Benjamin Weintraub & Alan N. Resnick, *Bankruptcy Law Manual,* ¶ 2.14, at 2-43 (Warren, Gordon & Lamont, Inc., 3d ed. 1992)).

13. Based on the legislative history of this statute, courts have uniformly held that in order to deprive an alleged debtor of control over its assets under section 303(f), it must be "shown that he may attempt to abscond with assets, dispose of them at less than their fair market value, or dismantle his business, all to the detriment of [his] creditors." *Id.* (internal citation omitted). However, the Petitioners provide <u>no</u> evidence of any dangers similar to the three described in that substantive test apart from the unsubstantiated allegation that the Alleged Debtors should not be paying professional fees that may arguably benefit Mr. Louis Mercatanti, the Alleged Debtors' founder, Chief Executive Officer and majority shareholder.

14. Essentially, the Petitioners, having unilaterally decided to rescind the out-of-court Restructuring Agreement reached between the parties and which was under implementation for nearly two years , are of the mindset that the Alleged Debtors' should capitulate to the lender syndicate's recent demand for an immediate liquidation. Put differently, the Alleged Debtors' desire to properly explore and evaluate the panoply of reorganization options available to them apparently has been viewed by the lender syndicate as a declaration of war, rather than what was actually intended – a good faith effort to maximize the value of the Debtors' businesses for the mutual benefit of all constituents and stakeholders involved.

15. Against this backdrop, the Petitioners move before this Court by insinuation, and not by any fact pleading, in a transparent effort to disrupt the Debtors' preparation for a smooth entry into chapter 11 in a manner calculated to minimize disruption to operations,

#14954756 v5

creditors and non-insider employees, of which there are hundreds. The evidence will demonstrate that the averments proffered by the Petitioners are patently untrue, and are motivated by an attempt to force the Alleged Debtors to forego a thorough exploration of their restructuring options.

16. Importantly, section 303(f) of the Bankruptcy Code protects alleged debtors by allowing them to continue to "use, acquire, or dispose of property as if an involuntary case concerning the debtor had not been commenced", subject to the power of the bankruptcy court in unusual circumstances to order otherwise. To be sure, bankruptcy courts have been disinclined to "order otherwise" absent circumstances suggesting waste of the alleged debtor's business. Here, the Petitioners have offered <u>no</u> evidence of any wrongdoing, and their adjectival assaults upon the character of the Alleged Debtors' principal, Mr. Mercatanti, a highly respected businessman who has owned and operated the Alleged Debtors for over 25 years, are intemperate and insupportable.[3]

17. At bottom, the Petitioners are not entitled to the extraordinary relief that they seek in the Motion.

**B.      The Scope of the Petitioners' Proposed Restrictions Sweep Too Far and Lack Support Under Section 303(f) of the Bankruptcy Code**

18. The Petitioners aver that they merely wish to impose "limited" restrictions upon the Alleged Debtors' cash expenditures at this late stage in the Gap Period, but the primary effect of these prohibitions seems to be aimed at disrupting the Alleged Debtors' ability to operate their businesses and respond to the Petitioners' involuntary chapter 7 filings.

---

[3] Particularly notable is the fact that the Motion points to no improprieties committed by the Alleged Debtors during the Gap Period (as none have occurred), merely alleging, in unsubstantiated fashion, that the Petitioners "upon information and belief, are concerned that the Alleged Debtors' cash is being utilized to advance Mr. Mercatanti's personal agenda . . ." <u>See</u> Motion at para 5, pp. 3-4. There is something to be said for statements that are supported by fact and evidence, but there is nothing to be said for the sort of unfounded insinuations proffered by the Petitioners in the Motion.

#14954756 v5

19. The Motion implies that the Alleged Debtors should be prevented from paying the fees and expenses of their chosen counsel and advisors under the guise of those payments potentially benefiting Mr. Mercatanti, in his individual capacity. During the Gap Period, the Debtors have made <u>no</u> payments whatsoever to Mr. Mercatanti's personal counsel at the law firm of Fox Rothschild LLP, nor will they during the remainder of the Gap Period. If the Petitioners wish to limit or otherwise restrict the Alleged Debtors from retaining and paying counsel of their choosing to adequately advise and represent them in the context of involuntary cases instituted by the Petitioners themselves, neither the operative case law nor notions of equity lend itself to such a result.[4]

20. It is beyond peradventure that the Alleged Debtors choice of counsel should be disturbed in only the "rarest of cases." *See In re Mandell,* 69 F.2d 830, 831 (2d Cir. 1934) ("Only in rarest cases should the trustee be deprived of the privilege of selecting his own counsel . . ."); *Vergos v. Timber Creek, Inc.,* 200 B.R. 624, 628 (W.D. Tenn. 1996) ("The debtor's right to choose qualified counsel should be disturbed only in the rarest cases."); *In re Premier Farms, L.C.,* 305 B.R. 717, 720 (Bankr. N.D. Iowa 2003) (same). By trying to impose prohibitions on the Alleged Debtors' payments to their professionals, the Petitioners are improperly attempting to use Bankruptcy Code section 303(f) to interfere with the Alleged Debtors' right to retain professionals of their choosing, and the Court should not countenance gamesmanship of this sort.

---

[4] Petitioners' cite to the decision in *In re Commonwealth Sprinkler Co., Inc.*, 295 B.R. 852 (Bankr. E.D. Va. 2003), in which counsel to an involuntary chapter 7 debtor sought approval of fees incurred during the gap period. The bankruptcy court denied such a request under section 330(a), based on the court's rationale that the language of section 330(a) did not permit payment of fees to counsel to a chapter 7 debtor. In the alternative, the court also ruled that counsel was not entitled to a <u>priority</u> claim for charges relating to the defense of the involuntary petition. Even assuming that this decision was correctly decided and binding here (which the Alleged Debtors are not conceding), the holding does not stand for the proposition that counsel may not be paid by an involuntary chapter 7 debtor for services rendered during the gap period. Moreover, in the matter *sub judice*, counsel has not sought the grant of a priority claim for any of its gap period services.

#14954756 v5

i. **Although No Such Risk Exists, the Alleged Debtors Would Agree to Prohibit Transfers to (i) Their Officers, Directors and Shareholders Outside of the Ordinary Course, and (ii) to Mr. Mercatanti's Personal Attorneys, During The Remainder of the Gap Period**

21. As noted, there is no evidence that the Alleged Debtors have engaged in improper and prohibited transfers during the Gap Period.

22. The Alleged Debtors have no intention of doing so, and in order to address any unsubstantiated concerns of the Petitioners, the Alleged Debtors would consent to entry of the proposed order (the "Proposed Order"), attached hereto as "Exhibit A", which would prohibit, during the remainder of the Gap Period: (i) any transfers of cash to the Alleged Debtors' officers, directors and shareholders, outside of the ordinary course of business, and (ii) and payments by the Alleged Debtors to Mr. Mercatanti's personal counsel at Fox Rothschild LLP.

**CONCLUSION**

23. Based upon the foregoing, and as the evidence at the hearing on the Motion (and this Response) will demonstrate, the Petitioners seek the extraordinary remedy of placing "limited" restrictions on the Alleged Debtors' cash expenditures during the remainder of the Gap Period in an effort to force them to capitulate to the lender syndicate's unjustified demand for an immediate liquidation of these businesses. It would, however, be an extraordinary thing for the Petitioners to succeed in imposing unreasonable and unwarranted limitations on the Alleged Debtors ability to operate and prepare for a smooth landing into chapter 11 and which find no support in the Bankruptcy Code or the case law.

24. Accordingly, the Motion should be denied. Alternatively, to the extent that the Court is inclined to afford the Petitioners some form of limited relief here, the Alleged Debtors respectfully request that it consider the same in the context of the Proposed Order.

-9-

WHEREFORE, for the reasons set forth above, the Alleged Debtors respectfully request that: (i) the Court overrule the Motion and deny the relief requested therein, or, in the alternative, (ii) enter the Proposed Order attached hereto as <u>Exhibit A</u>, in substantially the same form, and (iii) grant such other and further relief as the Court deems to be just and proper.

Dated:  October 5, 2011
        Wilmington, Delaware

Respectfully submitted,

PEPPER HAMILTON LLP


/s/  James C. Carignan
David M. Fournier (DE No. 960)
James C. Carignan (DE No. 4230)
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
Tel:  302.777.6500

-and-

Leon R. Barson, Esq.
Pepper Hamilton LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
Telephone: (215) 981-4000

Counsel for the Alleged Debtors

-10-