# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11[2] |
| Nassau Broadcasting Partners, L.P., *et al.,*[1] | Case Nos. 11-12934 (KG) |
| Debtors and Debtors-in-Possession. | (Jointly Administered) |

## DECLARATION OF PETER D. TONKS, CHIEF FINANCIAL OFFICER OF NASSAU BROADCASTING PARTNERS, L.P., IN SUPPORT OF FIRST DAY MOTIONS

I, Peter D. Tonks, hereby declare under penalty of perjury that I am over the age of 18, am competent to testify about the following matters, and that:

1.     I am the Chief Financial Officer of Nassau Broadcasting Partners, L.P. ("Nassau"), a Delaware limited partnership and one of the above-captioned debtors (the "Debtors") in these bankruptcy cases. I have served in that capacity for the last seventeen years.

2.     As Debtors' Chief Financial Officer, I am responsible for the Debtors' finance, treasury and tax functions and serve as an integral member of the Debtors' senior management team. I am generally familiar with the Debtors' day-to-day operations, business affairs, financial affairs, books and records.

3.     On the date hereof, the Debtors filed a motion to convert these cases to cases under Chapter 11 of Title 11 of the United States Code (11 U.S.C. §§ 101 *et. seq.* as amended, the "Bankruptcy Code"). The Debtors, upon the approval of the

---

[1] The Debtors are the following entities (last four digits of EIN in parentheses): (i) Nassau Broadcasting Partners, L.P., a Delaware limited partnership (9866), (ii) Nassau Broadcasting I, LLC, a Delaware limited liability company (7047), (iii) Nassau Broadcasting II, LLC, a Delaware limited liability company (2048), and (iv) Nassau Broadcasting III, LLC, a Delaware limited liability company (9570). The mailing address for the Debtors is 619 Alexander Road, Third Floor, Princeton, NJ 08540.

[2] Motions for Joint Administration and Conversion to Chapter 11 of these cases are pending.

motion to convert, will operate their businesses and manage their properties as debtors in

possession pursuant to sections 1107 (a) and 1108 of the Bankruptcy Code.

4.      To minimize the adverse effects that the Debtors' bankruptcy

status could have on their operations, the Debtors have requested various types of "first

day" relief (such requests are collectively referred to herein as the "First Day Motions").

The First Day Motions, which are discussed with more particularity in Section II below,

seek relief intended to allow the Debtors to maintain their ongoing business operations

and fulfill their duties as debtors in possession.  I am familiar with the contents of each

First Day Motion (including the exhibits thereto), and believe that the relief sought in

each of the First Day Motions: (a) is necessary to enable the Debtors to operate in

Chapter 11 with minimum disruption or loss of productivity or going concern value; (b)

is critical to preserving the value of the Debtors' assets and their estates, and to avoid

immediate and irreparable harm to the Debtors and their estates; and (c) is in the best

interests of the Debtors, their estates, creditors and other parties in interest.

5.      I submit this declaration in support of the First Day Motions.[3]

Except as otherwise indicated, all facts set forth in this declaration are based upon my

personal knowledge, information supplied to me by other employees of the Debtors

reporting to me in the ordinary course of business, learned from my review of relevant

documents, books and records, or are based upon my opinion borne of my experience and

knowledge of the Debtors' operations and financial affairs.  I am authorized to submit

this declaration on behalf of the Debtors, and if I were called upon to testify I could and

would testify competently to the veracity of facts set forth herein.

---

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the
relevant First Day Motion.

#14982206 v5

6. Part I of this declaration describes the Debtors' businesses, their capital structure, and the circumstances surrounding the commencement of these cases. Part II sets forth the relevant facts in support of each First Day Motion. A summary corporate organizational chart is attached to this declaration as **Exhibit A**.

## I.    OVERVIEW OF THE DEBTORS' OPERATIONS

### A.    Debtors' History and Corporate Structure

7. Debtor Nassau Broadcasting Partners, L.P. ("NBP") is a holding company that has three (3) direct or indirect subsidiaries, all of whom are debtors in these bankruptcy proceedings: (i) Nassau Broadcasting I, LLC ("NBI"), the operating company; (ii) Nassau Broadcasting II, LLC ("NBII"), which is wholly-owned by NBI and (iii) Nassau Broadcasting III, LLC ("NBIII"), which also is wholly-owned by NBI.

8. NBI is the operating company, and owns and operates forty-nine (49) radio stations in seven (7) states. Both NBII and NBIII are license holding companies whose sole function is to hold the FCC licenses that are utilized in connection with the operations of NBI's radio stations.

9. The Debtors' corporate predecessor, Nassau Broadcasting Company, was founded in the 1960s to own and operate two radio stations, an AM & FM combo, in Princeton, New Jersey. In 1986, Debtors' current CEO, Louis Mercatanti, purchased a majority interest in Nassau Broadcasting Company. In 1996, when the Federal Communications Act of 1996 relaxed substantially then-existing "multiple ownership" rules, Nassau Broadcasting Company raised significant capital, in the form of private equity and debt, and acquired approximately nineteen (19) additional radio stations. At that time, NBP was formed.

#14982206 v5

10.     In 2003, following the sale of a number of the company's radio stations, the Debtors were recapitalized and embarked on a further expansion to its current size of forty-nine (49) radio stations. A complete list of the radio stations and the entity to which it is licensed is attached hereto as **Exhibit B**. To finance that recapitalization and expansion, the Debtors entered into a senior secured credit facility with a lending syndicate (the "Prepetition Lenders") led by the agent to the Prepetition Lenders, Goldman Sachs Credit Partners, L.P. ("Goldman"), ultimately totaling $183,000,000 in principal and presently documented by a Second Amended and Restated Credit and Guarantee Agreement dated as of August 31, 2005 (together with all amendments, supplements, reaffirmations, exhibits, schedules and attachments related thereto, the "Credit Agreement").

11.     In connection with the Credit Agreement, on or about August 31, 2005, the Debtors entered into that certain Second Amended And Restated Pledge And Security Agreement (together with all exhibits, schedules, supplements, assignments, control agreements, amendments and reaffirmations, the "Security Agreement"). Pursuant to the Security Agreement, the Prepetition Lenders have purported security interests (the "Prepetition Lenders' Liens") on substantially all of the Debtors' pre-Relief Date assets, including accounts, chattel paper, documents, general intangibles, goods, instruments, insurance, intellectual property, investment property, letter of credit rights, money, receivables, and commercial tort claims, as well as products, proceeds, accessions, rents and profits of same. The Prepetition Lenders' Liens do not extend to the Debtors' interest in the FCC licenses, arguably the most valuable asset of the estates,

though the Security Agreement does, according to its terms, purport to include proceeds of any sale or assignment of licenses.

### B.    The Debtors' Business and Markets

12.    The Debtors generate substantially all of their income from the sale of advertising, which they broadcast on their radio stations. As a result, Debtors' revenue is affected by the advertising rates charged, which in turn is dependent upon the ability to attract listeners in a given market and, of course, general economic conditions that affect advertisers' marketing expenditures.

13.    The Debtors' stations operate and compete in twelve differently-rated markets in seven states. These markets and a description of the Debtors' position in each such market are identified and described in **Exhibit C** attached hereto. NBI has approximately 325 full or part-time employees, is current on all payroll and tax obligations, and is current on insurance premium obligations. The Debtors generally have been timely paying debts owed to vendors, insurers, employees and other ordinary course transaction parties as they come due.

### C.    Summary of Pre-Petition Indebtedness

14.    As of the date hereof, amounts owed under the Credit Agreement total approximately $283,742,525. The Debtor NBP also owes approximately $200,000 to T.D. Bank, successor to Commerce Bank, under a lease for certain equipment in which T.D. Bank asserts a lien.

15.    In addition, one or more of the Debtors are obligated to Manning Broadcasting, Inc., which is the former owner of two (2) radio stations, arising from the Debtors' purchase of such stations in April of 2005. Specifically, one or more of the Debtors are obligated under a promissory note executed in connection with this

#14982206 v5

transaction having a present balance of approximately $1,083,000 as well as employment agreements with Eugene Manning and Frederick Manning which have approximately four (4) more years to run, representing compensation and benefits of in excess of an additional $1,456,000.

16.     Lastly, the Debtors owe approximately $2,000,000 in unsecured trade debt and other obligations normal and customary in the radio business, including to Arbitron, Inc., the radio rating agency crucial for establishing advertising rates in rated markets, and ASCAP and BMI, artist representatives who collect and distribute copyright fees.

### D.     Events Leading to Chapter 11

17.     In 2006, in anticipation of the September 30, 2008 maturity of indebtedness under the Credit Agreement, Debtors began exploring possible avenues for refinancing.  In connection with such efforts, Debtors engaged Goldman, as agent to the Prepetition Lenders, in refinancing negotiations.  However, a confluence of economic factors arose which ultimately made refinancing unsuccessful.  Most importantly, the Debtors' operations were adversely affected by the economic malaise affecting the country, most severely from 2007 – 2009.  Indeed, this recession resulted in an approximate 40% decline in operating cash flows.

18.     In an attempt to alleviate the impact of declining revenues, the Debtors significantly downsized their operations, reducing their labor force by approximately 30%.  This and other cash-saving measures increased the Debtors' operating margin by approximately 22%.  The Debtors also continued to pursue refinancing negotiations with the Prepetition Lenders.  Throughout these negotiations,

#14982206 v5

through and including August 2008, Debtors continued to make all required interest payments under the Credit Agreement.

19.    On April 15, 2009, Debtors and the Prepetition Lenders entered into a restructuring agreement (the "Restructuring Agreement") contemplating that 85% of the equity in NBP would be conveyed to the Prepetition Lenders in satisfaction of Debtors' obligations under the Credit Agreement.  The Restructuring Agreement also contemplated a sale of the Debtors' radio station assets in Boston, MA, with the proceeds paid to the Prepetition Lenders, and Debtors' entry into a new $50,000,000 senior secured lending facility.  In November of 2009, as anticipated under the Restructuring Agreement, the Debtors sold their Boston assets and paid (i) $10,750,000 to the Prepetition Lenders, as well as (ii) $1.6 million in legal fees of the Prepetition Lenders. In addition, in April 2011, the Debtors paid another $900,000 in the Prepetition Lenders' legal fees.

20.    Because this restructuring would have resulted in a change in control of the Debtors, FCC consent was required before the arrangement closed.  The FCC approved the transition of ownership contemplated by the Restructuring Agreement on February 25, 2010.  Despite the FCC's approval of the proposed restructuring, however, the Prepetition Lenders elected not to close the transaction within the ninety (90) day time period established by the FCC.  The Debtors joined with the Prepetition Lenders in obtaining four (4) ninety (90) day extensions of this deadline from the FCC. The last extension was scheduled to expire on February 15, 2011.

21.    On April 20, 2011, the Prepetition Lenders sent the Debtors a letter stating their decision to terminate the Restructuring Agreement.  Thereafter, Debtors

-7-

continued to negotiate with the Prepetition Lenders to attempt to negotiate an alternative restructuring arrangement.

22.     In October of 2010, the Debtors presented a plan to Goldman to purchase indebtedness under the Credit Agreement for approximately $52 million in cash. Over the next three months, Debtors and Goldman negotiated a Term Sheet that Debtors understood was acceptable to all of the Prepetition Lenders. The Debtors obtained financing for this transaction, final confirmation for which was provided from an outside lender in August of 2011. However, on August 4, 2011, the Prepetition Lenders sent a letter to the Company's CEO requesting that he cause the Debtors to file voluntary Chapter 11 bankruptcy petitions to facilitate a liquidation and sale under section 363 of the Bankruptcy Code. This August 4th demand did not include specific sale terms, and the Debtors responded that they were not prepared to commence bankruptcy proceedings at that time. Debtors again sought to engage Goldman in negotiations requesting alternatives to bankruptcy for the restructuring of debt, including advising Goldman that the $52 million proposed for the repurchase of the debt was now fully funded.

23.     On August 23, 2011, the Prepetition Lenders again rejected this proposal and reiterated their demand that the CEO cause the Debtors to commence Chapter 11 proceedings by September 2, 2011. On September 13, 2011, the Debtors requested from Goldman information as to its view of the basic terms of a section 363 sale, but on September 15, 2011, the Prepetition Lenders filed the Involuntary Chapter 7 petitions.

24.     Subsequent to the filings of the Involuntary Petitions, the Debtors submitted several proposals to Goldman to repurchase the outstanding debt. The Prepetition Lenders have not yet provided a formal response to this proposal.[4]

25.     Other than other undisputed principal owed under the Credit Facility (the terms of which have been the subject of refinancing negotiations, as set forth above), Debtors have been timely paying their creditors in the ordinary course. Debtors are strong competitively in the markets in which they operate. Attached hereto and marked as **Exhibit D**[5] are the Debtors' gross revenues and broadcast cash flows for the period of 2007 through 2011. By way of summary, the Debtors have been operating on a cash-flow positive basis for the past six months, and over such period revenues have exceeded operational and capital expenditures by approximately $0.8 million.

26.     A liquidation in Chapter 7 would benefit neither the estates nor the Debtors' creditors, least of all the Involuntary Petitioners. In response to the Involuntary Petitions, the Debtors have filed a motion to convert these cases to cases under Chapter 11 of the Bankruptcy Code, in order to pursue all appropriate restructuring options and to maximize the going concern value of their business and estates for the benefit of all creditors and parties-in-interest. In connection with this request for conversion of these cases to Chapter 11 cases, Debtors have filed contemporaneously herewith several requests for "first day" relief typical of Chapter 11 debtors of similar size and industry.

## II.     FIRST DAY MOTIONS

### A.     Motion For An Order Directing Joint Administration Of Related Chapter 11 Cases (the "Joint Administration Motion")

---

[4] Of the total borrowings under the Credit Agreement since 2002 of $183 million, Debtors have repaid approximately $135 million in the form of interest, principal and legal fees.

[5] **Exhibit D** includes reasonable estimates for the remaining months of 2011.

#14982206 v5

27.     Pursuant to the Joint Administration Motion, the Debtors seek entry of an order directing the joint administration of the Debtors' Chapter 11 cases and the consolidation thereof for procedural purposes only, in the lead case of Nassau Broadcasting Partners, L.P. (Case No. 11-12934).

28.     I have been advised that many of the motions, applications, hearings, and orders that will arise in these Chapter 11 cases will affect all the Debtors jointly. I have also been advised that the Debtors' interests, as well as the interests of their creditors and other parties-in-interest, would be best served by joint administration.

29.     I have been advised that joint administration of these Chapter 11 cases will permit the Debtors, the Clerk of this Court and other parties to use a single docket for all of the cases and to combine notices to creditors and other parties-in-interest. Additionally, I have been advised that, as there likely will be numerous motions, applications, and other pleadings filed in these Chapter 11 cases that will affect all, or at least most, of the four Debtors, joint administration will significantly reduce the volume of paper that otherwise would be filed with the Clerk of this Court, will reduce the expense and burden attendant to various administrative tasks and will minimize unnecessary delays. Moreover, I have been advised that joint administration also will enable all parties-in-interest (including the U.S. Trustee) in each of the Chapter 11 cases to stay apprised of all events transpiring in these cases.

30.     I therefore believe the relief requested in the Joint Administration Motion is necessary and appropriate and is in the best interests of the Debtors' estates, creditors, and other parties-in-interest.

B.     **Motion For Entry Of Interim And Final Orders Authorizing The Debtors To (A) Continue To Operate The Cash Management System;**

-10-

**(B) Honor Certain Pre-Relief Date Obligations Related To The Cash Management System; (C) Maintain Existing Bank Accounts And Business Forms; And (D) Grant Administrative Priority For Intercompany Claims And Continue To Perform Under Certain Intercompany Arrangements And Historical Practices (the "Cash Management Motion")**

31.     By the Cash Management Motion, the Debtors seek entry of an order authorizing the Debtors to: (i) maintain their existing bank accounts; (ii) continue to use their existing business forms and check stock; (iii) continue to utilize their existing Cash Management System; (iv) forgo compliance with the deposit and investment guidelines imposed under section 345(b) of the Bankruptcy Code; (v) grant administrative priority to intercompany claims and to continue to perform under certain intercompany arrangements and historical practices; and (vi) scheduling a final hearing to consider entry of a final order granting the relief requested in the Cash Management Motion.

32.     In the ordinary course of business, the Debtors use a centralized Cash Management System to account for collections from their operations and to pay for ordinary course expenses.  The use of Cash Management System facilitates the timely and efficient collection, management, and disbursement of funds used in the Debtors' business.

33.     The Debtors' Bank Accounts are maintained at TD Bank, Bank of America, PNC Bank, TD/Bank North, Sovereign Bank and Wells Fargo.  It is the Debtors' understanding these institutions that have been approved by the U.S. Trustee as Authorized Bank Depositories.

34.     The cash management procedures employed by the Debtors constitute ordinary, usual and essential business practices and are similar to those used by

-11-

other major corporate enterprises. The Cash Management System provides significant benefits to all of the Debtors, including the ability to control corporate funds centrally and to ensure the availability of funds when necessary by the Debtors in the operation of their business.

35. The Debtors maintain their Cash Management System through an operating account, depository accounts, sweep accounts, a payroll account, and savings accounts. Payments by the Debtors' customers are generally made via checks delivered to a lock box at locations where the Debtors also maintain depository accounts. Credit card payments are also accepted at these same locations. On a weekly basis, the Debtors transfer funds from these depository accounts to the Operating Account. The Operating Account is utilized for financial transactions in connection with all of the Debtors' stations and radio network.

36. The Operating Account is the primary resting place of the Debtors' cash and is the account from which all disbursements are made. The Debtors' accounting departments submit check requests on a weekly basis to me. Upon approval, the accounting departments will issue checks to payees which are drawn on the Operating Account.

37. The Debtors also maintain a Payroll Account at TD Bank used for the payment of employee net pay and payroll taxes. The Debtors' payroll is administered by ADP, a third-party service provider. Historically, approximately two days before payroll disbursements are scheduled to be made, gross wages and payroll tax expenses are transferred from the Operating Account to the Payroll Account. ADP then processes the Debtors' payroll by depositing funds into employees' bank accounts by electronic

transfer or by providing checks, depending on employee preference, and administering the payment of periodic taxes to the various taxing authorities.

38.     The Debtors also maintain savings accounts at TD Bank and Wells Fargo.  Occasionally, the Debtors deposit or transfer funds into these accounts to earn interest, but they always transfer funds back to the Operating Account prior to the funds being disbursed.  Finally, the Debtors have a small balance checking account maintained at Sovereign Bank that Debtors utilize for miscellaneous *de minimis* expenditures and petty cash.

39.     Maintenance of the Cash Management System is essential to the Debtors' continued operations and is in the best interests of all creditors and other parties-in-interest.  Further, changing correspondence and business forms during the Debtors' Chapter 11 cases would also be expensive and burdensome to the Debtors' estates and disruptive to the Debtors' business operations.

40.     I therefore believe that the relief requested in the Cash Management Motion is necessary and appropriate and is in the best interests of the Debtors' estates, creditors, and other parties-in-interest.

**C.     Motion For Order (I) Prohibiting Utility Companies From Discontinuing, Altering Or Refusing Service, (II) Deeming Utility Companies To Have Adequate Assurance Of Payment, And (III) Establishing Procedures For Resolving Requests For Additional Assurance (the "Utilities Motion")**

41.     By the Utilities Motion, the Debtors seek entry of an order (i) prohibiting providers of water, electricity, gas, heating oil, sewer, waste management, snow removal, cable-internet, security monitoring and telecommunications services to the Debtors (collectively, the "Utility Companies") from discontinuing, altering or refusing service to the Debtors; (ii) determining that the Utility Companies have been provided

-13-

with adequate assurance of payment on the basis of the establishment of a Utility Deposit Account; and (iii) approving the Debtors' proposed procedures for Utility Companies to request additional assurance of payment.

42.      The Debtors incur utility expenses for water, electricity, gas, heating oil, sewer, waste management, snow removal, cable-internet, security monitoring, and telecommunications services at their various locations in the ordinary course of business. Prior to the Relief Date, the Debtors spent approximately $134,000 each month for utility services.

43.      Uninterrupted utility services are essential to the Debtors' ongoing operations and therefore, to the success of their reorganization efforts. Should one or more of the Utility Companies refuse or discontinue service even for a brief period, it would severely disrupt the Debtors' operations, resulting in significant losses. Such an interruption would damage the Debtors' business to the detriment of their estates, creditors and employees. It is critical that utility services provided to the Debtors continue uninterrupted.

44.      Pursuant to the Utilities Motion, to provide adequate assurance of payment for future services to their Utility Companies, the Debtors propose to deposit, for the benefit of the Utility Companies, a sum equal to approximately 50% of the Debtors' estimated cost of monthly utility consumption – $67,000 – into an interest-bearing, newly-created, segregated account (the "Utility Deposit Account") within fourteen days (14) after the entry of an Order granting the Utilities Motion on an interim basis, with such Utility Deposit Account to be held in escrow pending further order of the Court. In addition, the Debtors seek to establish Adequate Assurance Procedures by

which a Utility Company may request additional assurance of future payment, if such Utility Company believes that the Utility Deposit Account does not provide it with satisfactory assurances. Such proposed Adequate Assurance Procedures are fully set forth in the Utilities Motion.

45.     If the Debtors lose utility service, the Debtors will be unable to operate, and the Debtors' business will be irreparably harmed. If faced with imminent termination of utility services, the Debtors would be forced to pay whatever amounts are demanded by the Utility Companies and, I am advised, seek emergency relief in this Court to avoid the cessation of essential utility services and a severe disruption of the Debtors' business.

46.     I have been advised, and believe, that establishing the Utility Deposit Account, consisting of a substantial cash reserve relative to the Debtors' estimated monthly consumption, provides adequate assurance of post-Relief Date payment under section 366(c) of the Bankruptcy Code. In addition, the Adequate Assurance Procedures set forth in the Utilities Motion, whereby any Utility Company can request additional adequate assurance if it believes there are facts and circumstances that would merit greater protection than will be afforded by the Utilities Deposit Account, will provide an orderly process for Utility Companies to seek additional adequate assurance of payment without risking irreparable harm to the estate.

47.     I therefore believe the relief requested in the Utilities Motion is necessary and appropriate and is in the best interests of the Debtors' estates, creditors, and other parties-in-interest.

D.     **Motion For Order Under Sections 105, 363 And 507 Of The Bankruptcy Code (I) Authorizing Payment Of Pre-Relief Date Wages,**

-15-

**Salaries, And Employee Benefits, (II) Authorizing Continuation Of Employee Benefit Plans And Programs Post-Relief Date, And (III) Directing All Banks To Honor Pre-Relief Date Checks For Payment Of Pre-Relief Date Employee Obligations (the "Wages and Benefits Motion")**

48.     By the Wages and Benefits Motion, the Debtors seek entry of an order (i) authorizing the Debtors to pay or otherwise honor the Debtors' various employee-related pre-Relief Date obligations to, or for the benefit of, current employees, (ii) authorizing the Debtors to continue post-Relief Date the employee benefit plans and programs in effect immediately prior to Relief Date, and (iii) authorizing all banks to honor pre-Relief Date checks for payment of the Debtors' Pre-Relief Date Employee Obligations.

49.     If the Debtors fail to pay Employee wages or benefits, or if they fail to maintain Employee Benefit Programs, the Employees will suffer extreme personal hardship and in many cases could be unable to pay their basic living expenses.  This clearly would be detrimental to Employee morale and result in unmanageable Employee turnover during a critical stage of the Debtors' efforts to maximize the value of their estates.  Any significant deterioration in morale at this time would substantially impair the Debtors' ability to operate their business in Chapter 11, thereby resulting in immediate and irreparable harm to the Debtors and their estates.

50.     The obligations and benefits include, without limitation, (i) unpaid wages, salaries, holiday and vacation pay, sick leave pay and other "paid time off", and reimbursable business expenses, that were earned or incurred prior to the Relief Date (collectively the "Pre-Relief Date Employee Obligations"); and (ii) employee health and welfare benefit claims and programs arising before the Relief Date including, without limitation, (w) medical and dental claims under the Debtors' health care plans, (x) life

-16-

insurance and disability insurance, (y) workers' compensation insurance, and (z) retirement benefits (collectively, the "Employee Benefits").

51.     The Debtors submit that the amounts to be paid to or for the benefit of the Employees pursuant to the Wage and Benefits Motion are reasonable compared with the importance and necessity of preserving Employee morale and with the difficulties and losses the Debtors likely will suffer if those amounts are not paid. Accordingly, the Debtors seek authority to pay the Pre-Relief Date Employee Obligations and Employee Benefits (or to maintain accrued levels of benefits and continue such accrual where payment is not yet due) all in accordance with the policies, plans, and programs in place prior to the Relief Date and to continue post-Relief Date the Employee Benefit Plans and Programs in effect immediately prior to the Relief Date. Debtors are current up to the Relief Date on payment of all wages and benefits. However, Debtors have not yet paid for certain wages and benefits that have accrued but not yet become due. None of the pre-Relief Date accruals exceeds (for each employee) $11,725.

52.     I therefore believe the relief requested in the Wages and Benefits Motion is necessary and appropriate and is in the best interest of the Debtors' estates, creditors, and other parties-in-interest.

**E.     Motion Pursuant To Sections 105(a), 361(2) And 363(a), (c) And (e) Of The Bankruptcy Code And Rules 4001(b) And 6003 Of The Federal Rules Of Bankruptcy Procedure, For Entry Of Interim And Final Orders:  (I) Authorizing The Use Of Cash Collateral; (II) Granting Adequate Protection, Including Replacement Liens, To Pre-Petition Lenders; (III) Scheduling A Final Hearing; And (IV) Granting Related Relief (the "Cash Collateral Motion")**

53.     By the Cash Collateral Motion, the Debtors request entry of interim and final orders (i) authorizing the Debtors to use cash collateral; (ii) granting adequate protection to the Prepetition Lenders, including replacement liens on certain

-17-

post-Relief Date assets; (iii) scheduling a final hearing to consider granting the relief requested in the Cash Collateral Motion on a final and permanent basis; and (iv) granting related relief.

54.     The Debtors have an immediate need for liquidity to operate as Chapter 11 debtors-in-possession. Without access to cash collateral and the authority to use such funds in the ordinary course of their business, the Debtors will be unable to operate, generate revenue, satisfy Chapter 11 administrative expenses, meet payroll, pay premiums to insure estate assets, and reorganize. As such, I believe the Debtors' decision to utilize the cash collateral it has on hand to fund these cases and to continue operating is a sound exercise of reasonable business judgment.

55.     In am advised and believe that the Prepetition Lenders' Liens in the cash collateral (and other assets) sought to be used by the Debtors going forward is adequately protected within the meaning of section 363(c)(2) and (e) of the Bankruptcy Code. The Debtors have been operating on a cash flow positive basis and expect this to continue in Chapter 11. Further, Debtors intend to limit their expenditures to the extent set forth in the Budget, and to use cash collateral only for payment of ordinary course and Chapter 11 administrative expenses. In addition, use of the cash collateral will enable Debtors to preserve their value as a "going concern" business. Debtors' going concern value is much greater than their liquidation value.

56.     Furthermore, pursuant to the Cash Collateral Motion, the Debtors are proposing to grant replacement liens in accounts receivable generated post-Relief Date and their proceeds, to the extent of any diminution in the value of the Prepetition Lenders Liens resulting from Debtors' post-Relief Date use of cash collateral. I believe

#14982206 v5

that these replacement liens will provide an additional layer of protection to the Prepetition Lenders, especially given that the Debtors will be operating on a cash flow positive basis post-Relief Date.

57.    Finally, the Debtors have an urgent need to access the cash collateral to satisfy various ordinary course expenses presently coming due including payroll payable on October 15, 2011 (which must be funded by October 12 to ensure timely payment to employees).

58.    The value of the Debtors and/or their estates could suffer immediate and irreparable harm absent the relief requested in the Cash Collateral Motion. As set forth above, the Prepetition Lenders' Liens will be adequately protected from any diminution in value resulting from Debtors' use of cash collateral. I therefore believe the relief requested in the Cash Collateral Motion is necessary and appropriate and is in the best interests of the Debtors' estates, creditors, and other parties-in-interest.

**F.    Motion For Order Authorizing Payment Of Pre-Relief Date Premiums And Related Expenses Necessary To Maintain Insurance Coverage (the "Insurance Motion")**

59.    By the Insurance Motion, the Debtors request entry of an order authorizing, but not directing, the Debtors to pay pre-Relief Date premiums and related expenses necessary to maintain insurance coverage, to the extent that the Debtors determine in their discretion that such payment is necessary or appropriate to avoid cancellation, default, alteration, assignment, attachment, lapse, or any form of impairment to the coverage, benefits, or proceeds provided under the Insurance Policies.

60.    In the ordinary course of the Debtors' business, the Debtors maintain a number of insurance policies, including a commercial package policy, automobile insurance policy, workers compensation policy, a broadcasters liability

-19-

policy, an umbrella policy, employment practices liability insurance, and employed professionals liability insurance (collectively, the "Insurance Policies").

61.     The aggregate monthly payment to Insurance Companies on account of insurance premiums is approximately $37,310.  Maintenance of the Insurance Policies is essential to the preservation of the Debtors' businesses, property and assets and, in certain cases, the coverage provided by such policies is required by regulations, laws, or contracts that govern the Debtors' commercial activity.

62.     The Debtors believe that they are current on pre-Relief Date premiums.  However, the Debtors have not yet paid certain premiums that may relate, in part, to pre-Relief Date coverage, because such premiums have not yet come due.  As such, the Debtors are requesting authority to pay pre-Relief Date premiums, if any, necessary to maintain their coverage in current effect and, at their discretion and in the exercise of their business judgment, to revise, supplement, or change insurance coverage as needed.

63.     I believe that, absent the relief requested in the Insurance Motion, the Debtors would be forced to procure replacement coverage on an emergency basis, which coverage would likely be more expensive than the Debtors' current policies and require considerable cash expenditures.

64.     I therefore believe the relief requested in the Insurance Motion is necessary and appropriate and is in the best interests of the Debtors' estates, creditors, and other parties-in-interest.

**G.     Motion For Interim And Final Orders Authorizing, But Not Directing, Debtors To Honor Certain Prepetition Obligations To Customers And Otherwise Continue Certain Customer Programs**

**And Practices In The Ordinary Course Of Business (the "Customer Program Motion")**

65.     By the Customer Program Motion, the Debtors request entry of an order (i) authorizing, but not directing, the Debtors to honor the Customer Obligations, and (ii) authorizing all applicable banks and other financial institutions to receive, process, honor and pay all checks presented for payment of, and to honor all fund transfer requests made by the Debtors related to, the Customer Obligations.

66.     Due to the nature of the Debtors' business, particularly with respect to advertising sales to their Customers, the Debtors regularly accrue both cash and non-cash Customer Obligations.  As of the Relief Date, I estimate that approximately $55,000.00 in cash Customer Obligations remain outstanding and approximately $35,000.00 in non-cash Customer Obligations remain outstanding.  To preserve valued Customer relationships and minimize disruption to their operations, the Debtors request the authority to continue honoring their existing Customer Obligations.

**Barter Obligations**

67.     In certain markets, bartering — or the exchange of services in lieu of cash — is utilized by the Debtors.  More specifically, the Debtors provide advertising in exchange for goods or services received, including, but not limited to, bill payer, advertising, programming, promotional products, and other goods and services (the "Barter Obligations").  As of the Relief Date, the Debtors have certain outstanding Barter Obligations that will require the Debtors to provide Customers with advertising air time in the future in connection with goods or services that the Debtors have already received. The Debtors estimate that approximately $20,000.00 in unsatisfied Barter Obligations exist as of the Relief Date.

#14982206 v5

## Cash in Advance Ad Sales and Prepaid Events

68.     In the ordinary course of business, due to credit concerns or based on a client's cash payment schedule, the Debtors often receive payments of cash in advance for advertising.  These amounts are recorded as credits in the Debtors' accounts receivable ledger until the advertisement is aired and an invoice is applied against it. Some of these "cash in advance ad sales" are the result of overpayments made by an advertiser that ultimately need to be repaid or otherwise applied against future invoices. The Debtors will continue to owe or be required to perform advertising obligations based on pre-Relief Date cash in advance ad sales because the Debtors have already received the cash for advertisements that have yet to run.

69.     At various market levels and depending on the time of year, the Debtors often produce events, including listener appreciation concerts, promotional events, job fairs, and other public events.  The production of "prepaid events" includes costs associated with equipment and venue rentals, as well as payments to performers. The Debtors generally receive sponsorship money in advance of the prepaid event from advertisers, which affords the advertisers the ability to co-produce the prepaid event or be included in any promotional advertisements related to the prepaid event.  The Debtors have also occasionally incurred obligations prior to the prepaid events, obligating them to make payments in the future.  In addition, certain prepaid events result in the sale of tickets in advance of the event in question.  As a result, the Debtors currently have obligations to produce prepaid events and honor sponsorship and advance ticket payments related thereto.  Cash in advance ad sales, together with prepaid events, are hereafter collectively referred to as the "Cash in Advance Ad Sales and Prepaid Events").

#14982206 v5

The Debtors estimate their pre-Relief Date obligations relating to Cash in Advance Ad Sales and Prepaid Events total approximately $55,000.00.

## Customer Adjustments

70.     In the ordinary course of business, the Debtors may need to provide a credit to advertisers to compensate them for an error in the composition or the placement of an advertisement or otherwise. The particular station that needs to provide such a credit typically corrects the error by re-running the corrected advertisement. The adjustments made to the Debtors' accounting records are done through cash credits. The Debtors estimate their pre-Relief Date obligations relating to such credits total approximately $15,000.00.

## Unclaimed Prizes

71.     To promote listenership, the Debtors frequently offer their listeners prizes, which include, among other things, cash rewards, merchant gift certificates, concert tickets, and out-of-town-travel trips. These prize programs vary in length and prize amounts among the Debtors' various radio stations.

72.     Depending on the type of prize awarded, listeners have a certain number of days to claim their prizes. As of the Relief Date, certain prizes (the "Unclaimed Prizes") had not yet been claimed by the winning listeners. The Debtors believe, however, that any amount owed in connection with any Unclaimed Prizes is not significant. However, out of an abundance of caution, the Debtors seek authority to honor and satisfy any claims based on Unclaimed Prizes.

#14982206 v5

73. I therefore believe the relief requested in the Customer Program Motion is necessary and appropriate and is in the best interests of the Debtors' estates, creditors, and other parties-in-interest.

**H.** **Motion For Entry Of Interim And Final Orders Authorizing Payment Of Claims Arising After The Involuntary Date But Before The Relief Date And Authorizing Payment Of All Checks Issued Before The Relief Date (the "Gap Period Motion")**

74. By the Gap Period Motion, the Debtors request entry of an order (i) authorizing Debtors to make payments (the "Gap Period Payments") between the Involuntary Date and the Relief Date (the "Gap Period") for obligations incurred in the ordinary course of the Debtors' business; (ii) authorizing the Debtors' banks to honor checks issued by the Debtors before the Relief Date, including Gap Period Payments as well as the Pre-Involuntary Date Obligation Checks; and (iii) scheduling a final hearing to consider entry of a final order granting the relief requested in the Gap Period Motion on a final basis.

75. The Debtors have on deposit sufficient funds in their bank accounts to satisfy all Gap Period Payments and Pre-Involuntary Date Obligation Checks so that their banks will not be prejudiced by any order authorizing them to honor such checks. Failure to timely honor these payments could harm the Debtors and their estates by alienating entities with which the Debtors transact ongoing business and by constricting the post-Relief Date trade credit available to the Debtors. As such, I believe that authorizing the Gap Period Payments and Pre-Involuntary Date Obligation Checks is crucial to Debtors' ongoing operations as well as to preserve the Debtors' value as a going concern.

#14982206 v5

76.     I therefore believe the relief requested in the Gap Period Motion is necessary and appropriate and is in the best interests of the Debtors' estates, creditors, and other parties-in-interest.

**I.      Application to Retain Epiq Bankruptcy Solutions, LLC as Claims, Noticing, and Balloting Agent (the "Application to Retain Epiq")**

77.     By the Application to Retain Epiq, the Debtors request entry of an order authorizing the appointment of Epiq Bankruptcy Solutions, LLC ("Epiq") as claims, noticing, soliciting, and balloting agent.

78.     I believe that the number of creditors in these Chapter 11 cases will exceed 200. I further believe it is necessary and in the best interests of creditors and the estates to engage Epiq to act as claims, noticing, and balloting agent in order to assume full responsibility for, among other things, the distribution of notices in the Debtors' Chapter 11 cases.

79.     I am advised and believe that there will be hundreds of entities that the Debtors will be required to serve with certain of the notices, pleadings, and other documents filed in these Chapter 11 cases. The appointment of Epiq will expedite the distribution of notices and relieve the Clerk's office of the administrative burden of processing such notices. The Debtors' estates and creditors will benefit as a result of Epiq's experience and cost-effective methods.

80.     I understand the actions and procedures Epiq will undertake as claims, noticing, and balloting agent will include, but not be limited to, the following: (i) notifying all potential creditors of the filing of these Chapter 11 cases and of the setting of the first meeting of creditors, pursuant to section 341(a) of the Bankruptcy Code; (ii) filing certificates or affidavits of service for all mailings, including a copy of

-25-

each notice, a list of persons to whom such notice was mailed, and the date mailed; and (iii) providing any other distribution services as are necessary or required.

81.     Epiq will also undertake certain claims-related duties, such as: (i) docketing all claims filed, maintaining the official claims register on behalf of the Clerk, and providing the Clerk with an exact duplicate thereof; (ii) specifying in the claims register for each claim docket the claim number assigned, the date received, the name and address of the claimant, and the asserted amount and classification of the claim; (iii) recording all transfers of claims and providing notices of such transfers as required pursuant to Bankruptcy Rule 3001(e); and (iv) maintaining the official mailing list for all entities who have filed proofs of claim, proofs of interest, or requests for notice.

82.     Epiq has advised me, and I believe, that considerable experience in providing similar services in large Chapter 11 cases. I believe that Epiq is eminently qualified to serve as claims, noticing, and balloting agent in these Chapter 11 cases.

83.     I therefore believe the relief requested in the Application to Retain Epiq is necessary and appropriate and is in the best interests of the Debtors' estates, creditors, and other parties-in-interest.

J.     **Debtors' Motion For Entry Of An Order Extending Time To File Schedules Of Assets And Liabilities, Schedules Of Executory Contracts And Unexpired Leases And Statements Of Financial Affairs (the "Extension Motion")**

84.     By the Extension Motion, the Debtors request entry of an order extending the time period for the Debtors to file their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules") through and including November 21, 2011 (which is

#14982206 v5

estimated at sixteen (16) days beyond the automatic thirty (30) day extension provided under Local Rule 1007-1(b)).

85.     Although the Schedules were not filed with the Debtors' petitions, annexed to the petitions are consolidated lists containing the names and addresses of the Debtors' 30 largest unsecured creditors.  In addition, the Debtors are in the process of preparing a creditor matrix containing all of the names and addresses of the Debtors' known creditors and other parties-in-interest in these cases as required by Bankruptcy Rule 1007(a).

86.     The Debtors have been unable to complete their Schedules at this early stage in the proceedings because of:  (a) the level of sophistication of their capital structures and their financial affairs; (b) the limited staffing available to perform the required internal review of the Debtors' books and records and accounts and affairs; (c) the diversion of resources necessary to attend to numerous issues in connection with the prosecution of these cases; and (d) the accelerated pace at which the Debtors' time-sensitive bankruptcy efforts have proceeded, including drafting first-day pleadings and responding to the Involuntary Petitions.

87.     At bottom, the scope and complexity of the Debtors' businesses, coupled with the limited time and resources available to the Debtors to marshal the information necessary to complete the Schedules, make it unlikely for the Debtors to complete the Schedules in the statutorily mandated timeframe without imposing an undue burden upon Debtors, their professionals and employees.  Because these factors will prevent the Debtors from assembling the information necessary to complete and file their Schedules prior to the current deadline, sufficient cause exists to grant the Extension.

#14982206 v5

88.     I therefore believe the relief requested in the Extension Motion is necessary and appropriate and is in the best interests of the Debtors' estates, creditors, and other parties-in-interest.

**K.     Debtors' Motion for Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals (the "Interim Compensation Motion")**

89.     By the Interim Compensation Motion, the Debtors request entry of an order establishing procedures for the interim compensation and reimbursement of fees and expenses for court-approved professionals on a monthly basis, on terms that satisfy the requirements of Local Rule 2016-2.

90.     The entry of such an order will streamline the professional compensation process and enable the Court and all other parties to more effectively monitor the professional fees incurred in these Chapter 11 cases.  In addition, the Debtors seek approval of procedures for reimbursement of reasonable out-of-pocket expenses (but not attorneys' fees) incurred by members of any statutory committee appointed in these cases.

91.     These proposed procedures will enable the Debtors to closely monitor the costs of administration, forecast cash flows, and implement efficient cash management procedures.  Moreover, these Compensation Procedures will allow the Court and the key parties-in-interest, including the Office of the U.S. Trustee, to ensure the reasonableness and necessity of the compensation and reimbursement sought by the Professionals retained in this case.

92.     I therefore believe the relief requested in the Interim Compensation Motion is necessary and appropriate and is in the best interests of the Debtors' estates, creditors, and other parties-in-interest.

## III.    RELIEF REQUESTED

93.    I respectfully request that the Court grant all relief requested in the First Day Motions and such other and further relief as may be just and proper.

#14982206 v5

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

By: _____
Peter D. Tonks
Chief Financial Officer
Nassau Broadcasting Partners, L.P.

Executed On October 6ᵗʰ, 2011