**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Nassau Broadcasting Partners, L.P., *et al.*,[1] | Case No. 11-12934 (KG) |
| Debtors and Debtors-in-Possession. | Hearing Date: October 12, 2011 at 8:30 a.m.<br>Objection Deadline: October 11, 2011 at 5:00 p.m.<br>Related Docket No. 26 |

**AGENT'S RESPONSE TO DEBTORS' MOTION, PURSUANT TO SECTIONS 105(a),
361(2) AND 363(a), (c) AND (e) OF THE BANKRUPTCY CODE AND RULES
4001(B) AND 6003 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, FOR
ENTRY OF INTERIM AND FINAL ORDERS: (I) AUTHORIZING THE USE OF
CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION,
INCLUDING REPLACEMENT LIENS, TO PREPETITION LENDERS;
(III) SCHEDULING A FINAL HEARING; AND (IV) GRANTING RELATED RELIEF**

Goldman Sachs Credit Partners L.P., as Agent ("**Agent**") under the Credit Agreement (as defined below), as and for its response to the Debtors' *Motion Pursuant To Sections 105(a), 361(2) and 363(a), (c) and (e) Of the Bankruptcy Code and Rules 4001(b) and 6003 Of the Federal Rules Of Bankruptcy Procedure, For Entry Of Interim and Final Orders: (I) Authorizing the Use Of Cash Collateral; (II) Granting Adequate Protection, Including Replacement Liens, To Prepetition Lenders; (III) Scheduling A Final Hearing; and (IV) Granting Related Relief* [Docket No. 26] (the "**Cash Collateral Motion**"), respectfully avers as follows:

---

[1] The Debtors are the following entities (last four digits of EIN in parentheses): (i) Nassau Broadcasting Partners, L.P., a Delaware limited partnership (9866), (ii) Nassau Broadcasting I, LLC, a Delaware limited liability company (7047), (iii) Nassau Broadcasting II, LLC, a Delaware limited liability company (2048), and (iv) Nassau Broadcasting III, LLC, a Delaware limited liability company (9570) (collectively, the "**Debtors**"). The mailing address for the Debtors is 619 Alexander Road, Third Floor, Princeton, NJ 08540.

## Preliminary Statement

1. As stated on the record of the hearing held before this Court on October 6, 2011, the Agent and the Lenders (defined below) have no desire to see a piecemeal liquidation of the Debtors. Rather, the Lenders fully support the continuation of the Debtors' operations as going concerns, provided that an expeditious sale process is implemented under section 363 of the Bankruptcy Code,[2] subject to the Agent and the Lenders' right to credit bid. The Lenders also are prepared to submit a stalking horse bid without any bidding protections, other than reasonable fee and expense reimbursement, in connection with such a process.

2. Moreover, based on Mr. Tonks' statement in his First Day Declaration that the amount of the Debtors' prepetition trade payables aggregates approximately $2 million, as part of such a stalking horse bid, the Lenders are prepared (subject to appropriate due diligence) to have the purchaser assume all such trade payables directly related to the Debtors' ongoing operations. Indeed, at the conclusion of this process, the Debtors' business operations would be appropriately capitalized, employment will be preserved, and value will be maximized for the Debtors' economic stakeholders. Simply stated, there is no reason to prolong these cases, risk erosion of enterprise value and incur substantial costs and expenses of administration to pursue a bootstrap plan or other ill-conceived strategy designed to preserve or extract value for existing equity which is admittedly woefully underwater.

3. Notably, in excess of 90% of the Debtors' equity is owned or controlled by the Debtors' CEO, Mr. Louis Mercatanti, Jr., and the balance is owned by two private equity firms, each of which, the Lenders understand, has walked away from its investment. Further,

---

[2] Capitalized terms used herein but not defined shall have the meanings ascribed to them in the Cash Collateral Motion.

Mr. Mercatanti and the Debtors have acknowledged that the Debtors have a negative net worth in excess of $245 million, and further demonstrating the utter lack of equity value, Mr. Mercatanti has offered to purchase the obligations owing to the Lenders at less than 20 cents on the dollar.

4. In this context and in view of the exigencies of the circumstances with respect to interim relief, the Lenders are willing to consent to the use of their cash collateral on an interim basis for a short period of time, pending a final hearing, on the terms set forth in the proposed form of interim order annexed hereto as <u>Exhibit A</u> (the "**Proposed Interim Order**"). The Lenders believe that the Proposed Interim Order is reasonable, assures the ongoing operations of the Debtors' business in the ordinary course, provides the Debtors with the ability to use cash collateral which the Lenders expect will be largely consistent with the Debtors' proposed budget, and provides the Lenders with customary and appropriate adequate protection under the circumstances.

5. It is the Lenders' hope and expectation that during the interim period they and the Debtors can agree upon an appropriate section 363 sale process with acceptable milestones and further use of cash collateral on a consensual basis necessary to implement that process. In the absence of such agreement, the Lenders reserve all of their rights with respect to any further use of cash collateral and all other matters related to these cases.

**Current Circumstances**

6. In the context of the Cash Collateral Motion and various statements made therein, the Lenders wish to address and clarify certain matters in order to accurately describe the current posture of these cases.

- Each of the Agent and the Lenders is a party to that certain Second Amended and Restated Credit and Guaranty Agreement, effective as of June 30, 2005 (as amended or supplemented, the "**Credit Agreement**"), pursuant to which the lenders thereunder (the "**Lenders**") made loans and advances to the Borrower thereunder, Nassau Broadcasting I,

3

LLC, a Debtor. The obligations (the "**Obligations**") under the Credit Agreement are unconditionally guaranteed by the other Debtors, and, accordingly, each of the Debtors is jointly and severally liable for all Obligations. As the Debtors have acknowledged in pleadings filed with this Court, the Obligations exceed $283 million.

- The Obligations are secured by liens on and security interests in substantially all of the assets and properties of each of the Debtors (other than FCC licenses themselves, but including any and all proceeds derived therefrom).

- The Obligations matured on September 30, 2008 and have remained outstanding since that time. Despite numerous opportunities, including a failed restructuring agreement appropriately terminated by the Lenders, the Debtors and their controlling shareholder, Mr. Mercatanti, have been unable to propose any viable or acceptable means to satisfy the Obligations owing to the Lenders.

- Despite the Debtors' inferences to the contrary, the restructuring agreement was terminated strictly in accordance with its terms because of the discovery of certain previously unknown and undisclosed claims. The Lenders had the absolute right to terminate the restructuring agreement and notably, the Debtors have never asserted anything to the contrary.

- Since the termination of the restructuring agreement and prior to the initiation of the involuntary bankruptcy cases, the only "restructuring" proposals forthcoming were from Mr. Mercatanti – which was an offer by him to purchase the Lenders' Obligations for less than 20¢ on the dollar.

- As stated, Mr. Mercatanti and the Debtors have acknowledged that existing equity is hopelessly under water and the Debtors' balance sheet plainly reflects the same.

- Despite the Debtors' assertions, the Debtors' financial statements reflect a cash flow deficit for the first 8 months of 2011, without the payment of any debt service to the Lenders.

- There is no question that in view of the blanket liens held by the Lenders, every dollar generated by the Debtors constitutes the Lenders' cash collateral, whether generated pre- or post entry of orders for relief. The Debtors' assertions to the contrary in the Cash Collateral Motion simply are erroneous.

7. As stated, the Lenders are prepared to consent to the use of their cash collateral on an interim basis in accordance with the terms and provisions of the Proposed Interim Order. The major substantive difference between the Debtors' bare bones proposed interim order and the Lenders' Proposed Interim Order is that the Lenders have provided for the traditional and customary grants of adequate protection consisting of (i) first priority security

4

interests in, and liens upon all of the Debtors' assets and properties of any nature whatsoever; (ii) allowed superpriority administrative expense claims in the amount of the Adequate Protection Obligations (as defined in the Proposed Interim Order); and (iii) payment by the Debtors of all prepetition costs, expenses and other charges of the Agent and the Lenders and the current cash payment of all of the Agent's and Lenders' ongoing incurred costs, expenses and other charges provided for under the Prepetition Loan Documents. Courts in this District routinely have conditioned the use of cash collateral based on the type of adequate protection provided for in the Proposed Interim Order. *See, e.g.*, *In re Friendly Ice Cream Corp., et al.*, Case No. 11-13167(KG) (Bankr. D. Del. Oct. 6, 2011) [Docket No. 56] (approving adequate protection consisting of, among other things, (i) replacement liens on all assets and properties; (ii) allowed administrative expense claim with respect to all adequate protection obligations; and (iii) payments consisting of fees, expenses, and charges); *In re Real Mex Restaurants, Inc., et al.*, Case No. 11-13122(PJW) (Bankr. D. Del. Oct. 6, 2011) [Docket No. 86] (same); *In re Chef Solutions Holdings, LLC, et al.*, Case No. 11-13139(KG) (Bankr. D. Del. Oct. 5, 2011) [Docket No. 54] (same).

        8.        The Lenders also are prepared to consent to a longer term use of cash collateral if an appropriate and expedited sale process is initiated under section 363 of the Bankruptcy Code. As stated, the Lenders believe that such a process will assure the ongoing viability of the Debtors' business enterprise, maximize value for those stakeholders with a real economic interest in the Debtors, including trade creditors, avoid undue costs and expenses and any erosion in value arising from a prolonged administration of these estates, and generally preserve employment for the Debtors' employees.

9. The Lenders, however, are not prepared to consent to the use of their cash collateral to enable existing equity, which is admittedly under water by orders of magnitude, to embark on a strategy to extract value for its interest where no such value exists and at the expense of all other parties in interest. The Debtors' business operations and all other parties in interest should not be compelled to fund this exercise particularly here where the Debtors' fiduciaries have plainly acknowledged the Debtors' hopelessly insolvent condition. Indeed, to permit such a strategy to unfold would be a classic misuse of "other peoples' money" which should not be countenanced by the Court.

RLF1 5452561v. 1

WHEREFORE, the Agent respectfully requests that any interim use of cash collateral be authorized in accordance with the Proposed Interim Order, subject to all reservation of rights therein with respect to final relief, and that the Agent and the Lenders be granted such other and further relief as is just.

Dated: October 11, 2011
       Wilmington, Delaware

Respectfully submitted,

*/s/ Lee E. Kaufman*
Daniel J. DeFranceschi (No. 2732)
Lee E. Kaufman (No. 4877)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

Stephen Karotkin
Ted Waksman
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Agent*