**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Nassau Broadcasting Partners, L.P., *et al.*,[1]<br><br>Debtors and Debtors-in-Possession. | Chapter 11<br><br>Case No. 11-12934 (KG)<br><br>(Jointly Administered)<br><br>Hearing Date: November 10, 2011 at 3:00 p.m.<br>Objection Deadline: November 1, 2011 at 5:00 p.m.<br>Related Docket Nos. 26, 72 |

**AGENT'S OBJECTION TO DEBTORS' MOTION, PURSUANT TO SECTIONS 105(a), 361(2) AND 363(a), (c) AND (e) OF THE BANKRUPTCY CODE AND RULES 4001(B) AND 6003 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, FOR ENTRY OF INTERIM AND FINAL ORDERS: (I) AUTHORIZING THE USE OF CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION, INCLUDING REPLACEMENT LIENS, TO PREPETITION LENDERS; (III) SCHEDULING A FINAL HEARING; AND (IV) GRANTING RELATED RELIEF**

Goldman Sachs Credit Partners L.P., as Agent ("**Agent**"), under the Credit Agreement (as defined below), as and for its objection (the "**Objection**") to the Debtors' *Motion Pursuant To Sections 105(a), 361(2) and 363(a), (c) and (e) Of the Bankruptcy Code and Rules 4001(b) and 6003 Of the Federal Rules Of Bankruptcy Procedure, For Entry Of Interim and Final Orders: (I) Authorizing the Use Of Cash Collateral; (II) Granting Adequate Protection, Including Replacement Liens, To Prepetition Lenders; (III) Scheduling A Final Hearing; and (IV) Granting Related Relief* (the "**Cash Collateral Motion**"), respectfully avers as follows:

---

[1] The Debtors are the following entities (last four digits of EIN in parentheses): (i) Nassau Broadcasting Partners, L.P., a Delaware limited partnership (9866), (ii) Nassau Broadcasting I, LLC, a Delaware limited liability company (7047), (iii) Nassau Broadcasting II, LLC, a Delaware limited liability company (2048), and (iv) Nassau Broadcasting III, LLC, a Delaware limited liability company (9570) (collectively, the "**Debtors**"). The mailing address for the Debtors is 619 Alexander Road, Third Floor, Princeton, NJ 08540.

RLF1 5543378v. 1

**Preliminary Statement**

1. As the Agent and the Lenders[2] have made clear to the Court, these are not complicated chapter 11 cases. The Debtors have acknowledged that the undisputed obligations to the Lenders exceed $283 million, and the prepetition claims of other creditors in these cases, as set forth in the Debtors' First Day Declaration, approximate $2-3 million, without taking into account payments that may have been made on account of such obligations pursuant to first day relief authorized by the Court. Moreover, based on the claims information set forth in the Debtors' First Day Declaration, the Lenders have made clear their willingness to promptly submit a stalking horse bid (without any bidding protections other than reasonable fee and expense reimbursement) in furtherance of an expedited 363 sale process, and as part of that stalking horse bid (subject to appropriate due diligence) provide that the purchaser will satisfy in full all prepetition and postpetition payables directly related to the Debtors' ongoing operations. What the Lenders are not prepared to do, however, is to satisfy obligations that are unrelated to the Debtors' business enterprise in order to relieve Mr. Mercatanti, the Debtors' 93% equity holder and the individual who controls the Board, from his own personal obligations. And, the Lenders are not willing to succumb to the Debtors' obvious strategy to prolong these cases and use the Lenders' cash collateral to extract value for existing equity, when it is absolutely clear that existing equity is hopelessly out of the money.

2. What is before the Court is a simple two party dispute. The Lenders, with claims secured by all of the Debtors' assets; and Mr. Mercatanti, the holder of essentially all of the Debtors' equity which he and the Debtors have plainly acknowledged is underwater by in

---

[2] The Lenders are parties to that certain Second Amended and Restated Credit and Guaranty Agreement, effective as of June 30, 2005 (the "**Credit Agreement**"), pursuant to which loans and advances were made to or for the benefit of the Debtors.

excess of $220 million. Despite these circumstances, the Debtors seek the authority of this Court to use the Lenders' cash collateral either to pressure the Lenders to distribute value to existing equity or to attempt to pursue the ultimate boot-strap cramdown plan in order to provide Mr. Mercatanti with an opportunity to control his hopelessly insolvent business enterprise on the backs of the secured creditors and other parties in interest.

3. Not only does this constitute a gross abuse of the chapter 11 process but, more importantly, the Lenders, the Debtors' other creditors and the Debtors' employees should not be held hostage and the value of the business enterprise jeopardized while the Debtors embark on an escapade designed solely for Mr. Mercatanti's benefit. Indeed, the failure of the Debtors' Board of Directors, undoubtedly controlled by Mr. Mercatanti and his nominees, to properly discharge its fiduciary duties is patently obvious.

4. As stated, the Lenders are prepared to move forward with an expeditious 363 sale process that will preserve and enhance the value of the business enterprise, preserve employment, pay legitimate prepetition operating claims in full and assure that the Debtors' business operations can continue with a sound capital structure to assure long-term viability. In stark contrast, the Debtors seek to use the Lenders' cash collateral, prolong the administration of these cases and risk value that belongs to the real economic stakeholders so they can pursue a cramdown strategy to protect existing equity. The Debtors' strategy is not surprising. The Debtors' controlling equity holder has nothing to lose because by his own admission, he has nothing at stake. Rather, he seeks to pursue his strategy utilizing estate assets and the Lenders' cash collateral. Of course, the Lenders have no objection to Mr. Mercatanti submitting a "qualified bid" in a 363 sale process. Instead of risking other people's money, the Lenders are perfectly happy to see him place his own money at risk.

3

5. The Lenders have no objection to the continued use of their cash collateral in a process leading to a 363 sale. In this regard, annexed hereto as Exhibit A is a proposed cash collateral order (the "**Proposed Final Order**") which the Lenders support and which will achieve this goal. In addition, attached hereto as Exhibit B is a proposed form of Asset Purchase Agreement the Agent and the Lenders are prepared to enter into as a stalking horse credit bid. The Lenders, however, are not prepared to further consent to the use of their cash collateral to foster a scheme designed to benefit existing equity at the expense of the business enterprise and to the detriment and prejudice of all other parties in interest. Notably, the Debtors now have filed pleadings seeking an additional eight weeks to use the Lenders' cash collateral to carry out this charade. Such a scheme is in direct contravention of the intent and purpose of the Bankruptcy Code and should not be countenanced by the Court.

## Background

6. Pursuant to the Credit Agreement, the Lenders made loans and advances to Nassau Broadcasting I, LLC, a Debtor. The Obligations under the Credit Agreement are unconditionally guaranteed by the other Debtors, and, accordingly, each of the Debtors is jointly and severally liable for all obligations. As noted above, the obligations exceed $283 million. The obligations matured on September 30, 2008 and have remained outstanding since that time. On September 15, 2011, certain of the Lenders filed involuntary chapter 7 petitions against the Debtors. On October 12, 2011 (the "**Relief Date**"), the Court entered orders converting the chapter 7 cases to chapter 11 cases.

7. Prior to the Relief Date, the Debtors filed the Cash Collateral Motion, seeking to use the Lenders' cash collateral on an interim and final basis. On October 11, 2011, the Agent filed its response to the Cash Collateral Motion (the "**Response**"). On October 12,

2011, the Court held a hearing on the Cash Collateral Motion. At the hearing, the Debtors and the Lenders agreed upon the terms and provisions of a proposed interim order (the "**Interim Order**") authorizing the use of the Lenders' cash collateral on an interim basis, and which scheduled a final hearing on the Cash Collateral Motion for November 10, 2011. Notably, the Lenders consented to the Interim Order in the spirit of cooperation and in the hope and expectation that an acceptable final order could be agreed to which would encompass an appropriate sale process.

8. Following entry of the Interim Order, on October 13, 2011, Manning Broadcasting, Inc. ("**Manning**") filed a motion (the "**Stay Relief Motion**") seeking relief from the automatic stay. According to the Stay Relief Motion, certain of the Debtors executed a promissory note (the "**Manning Note**") in the amount of $3.5 million for the benefit of Manning, guaranteed by Mr. Mercatanti. Manning seeks modification of the stay so it can terminate the second amendment to the Manning Note, thereby causing the indebtedness evidenced by the Note to be immediately due and payable. According to the Stay Relief Motion, Manning seeks to enforce the guaranty and seek payment from Mr. Mercatanti.

9. Subsequent to the entry of the Interim Order the attorneys for the Lenders and the attorneys for the Debtors have had limited discussions with respect to a sale process and the proposed terms of a final cash collateral order. Unfortunately, the Debtors have been completely unresponsive and these discussions have not moved forward in a productive manner, thereby necessitating the filing of this Objection. Indeed, the Lenders requested from the Debtors certain information regarding the Debtors' employee benefit plans so that the Lenders could appropriately address these matters in a proposed purchase agreement that would preserve employment. To date, this effort has been resisted by Debtors' counsel. Curiously, the Debtors

state in their supplemental motion seeking an extension of the Interim Order that they have had "constructive discussions" with the Lenders. The Lenders hardly would characterize the Debtors' "radio silence" as constructive.

**The Continued Use of Cash Collateral Should be
Conditioned on the Implementation of a Sale Process**

10. In view of the uncontrovertible facts and circumstances of these cases, the Lenders have provided the only logical and rational option – an expedited 363 sale process which, as stated, will unequivocally result in the following, promoting the intent and purpose of chapter 11 of the Bankruptcy Code:

- the continuation of the Debtors' business enterprise with a capital structure that will enable it to effectively compete in a difficult economic environment and assure its long term viability for the benefit of its employees, customers and other business partners. Indeed, on consummation of the sale, the Debtors will be totally de-levered;

- the payment in full (subject, of course, to appropriate due diligence) of the Debtors' prepetition trade payables relating to the Debtors' ongoing operations. Notably, the Debtors' First Day Declaration states these payables aggregate approximately $2 million and constitute virtually all of the Debtors' prepetition obligations, other than the Manning Note personally guaranteed by Mr. Mercatanti, and the obligations owing to the Lenders; and

- preserve and assure ongoing employment of employees of the Debtors.

11. Moreover, implementation of an expedited 363 sale process will avoid any erosion in enterprise value occasioned by an unduly prolonged chapter 11 case. In this regard, it should be noted that the Debtors' revenues, which are the best barometer of performance, are already off by in excess of 12% or nearly $220,000 in merely the first two weeks since the orders

for relief were entered.[3] And, again, who bears this risk? Clearly, not the Debtors or Mr. Mercatanti, but rather the Lenders, the Debtors' other creditors and the Debtors' employees, each of which are the real economic stakeholders in these cases. In fact, each month the Debtors are making payments to or for the benefit of Mr. Mercatanti aggregating in excess of $75,000, or $900,000 on an annual basis.

12. In stark contrast to a 363 sale process and its manifest benefits, the Debtors' strategy is fairly transparent – either to seek authority to use the Lenders' cash collateral over their objection in an attempt to prolong these cases to extract value for existing equity, or pursue some sort of convoluted "new value" plan and seek to cram it down on holders of in excess of $283 million of secured debt, again, solely to promote the economic interests and control of Mr. Mercatanti.

13. The Lenders submit that either course of action is completely inappropriate, and the use of the Lenders' cash collateral to facilitate the same is antithetical to the intent and purpose of chapter 11 of the Bankruptcy Code. Indeed, pursuit of a new value plan in the face of the Lenders' overwhelming secured debt and the requirements of *Bank of Am. Nat'l Trust & Savings Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999) is unprecedented and should not be sanctioned by the Court.

14. The Debtors' cavalier attitude and flagrant disregard of their fiduciary duties is patent, which is particularly egregious here because existing equity has nothing at risk. Mr. Mercatanti, by his own admission, is hopelessly out of the money and he seeks to use the Lenders' cash to pursue his ill-conceived scheme. Indeed, as stated, the entire risk falls on the

---

[3] Notably, the Debtors now want to retain a financial advisor funded by the Lenders' cash collateral at a cost of $125,000 per month, plus a success fee.

Lenders, other creditors and the Debtors' employees who represent the interests in these cases that should be protected.

15. The goal of these chapter 11 cases should not be the myopic pursuit of value for existing equity or to find a way to shield Mr. Mercatanti from his personal liability. Rather, the interests of creditors and preservation of the business enterprise should be the paramount concern. The Lenders are prepared to promote this goal, assure a viable enterprise and protect the interests of the real economic stakeholders. Unfortunately, the Debtors clearly do not share these views.

WHEREFORE, the Agent respectfully requests that any use of cash collateral on a final basis only be authorized in accordance with the Proposed Final Order, and that the Agent and the Lenders be granted such other and further relief as is just.

DATED: November 1, 2011
Wilmington, Delaware

/s/ Lee E. Kaufman
Daniel J. DeFranceschi (No. 2732)
Lee E. Kaufman (No. 4877)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

Stephen Karotkin
Ted Waksman
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

ATTORNEYS FOR AGENT